Paul LIVINGSTON and Sara Livingston, Plaintiffs-Appellants,

v.

George EWING, Individually and as Director of the Museum of New Mexico, Tibo Chavez, Mrs. Walter Mayer, Norris E. Bradbury, Father Benedict Questa, Linda Delgado, Frank Bateman, and Tony Reyna, all Individually and as members of the Board of Regents of the Museum of Santa Fe, Sam Pick, Individually and as Mayor of the City of Santa Fe, and Rudy Miller, Individually and as Chief of Police of the City of Santa Fe, and Joseph Allocca, Dora Battle, Bob Bernardinelli, Jim A. Coriz, Jr., Edward Gonzales, Louis Montano, Michael Runnels and Robert Stuart, Individually and as Council Members of the City of Santa Fe, Defendants-Appellees,

and

Dennis Anderson et al., Intervenors-Appellees.

No. 78–1683.

United States Court of Appeals, Tenth Circuit.

Argued May 30, 1979.

Decided June 14, 1979.

Emanuel Redfield, New York City, for plaintiffs-appellants.

Jill Z. Cooper, Asst. Atty. Gen., Santa Fe, N.M. (Toney Anaya, Atty. Gen., and Arthur J. Waskey, Asst. Atty. Gen., and Bob D. Barberousse, Santa Fe, N.M., on brief), for defendants-appellees.

Michael P. Gross and Solomon, Roth & Vanamberg, Santa Fe, N.M., for intervenors-appellees.

L. Lamar Parrish of Ussery, Burciaga & Parrish, Albuquerque, N.M., on brief for amicus curiae All Indian Pueblo Council, Inc.

Before McWILLIAMS and DOYLE, Circuit Judges, and MATSCH, District Judge.*

WILLIAM E. DOYLE, Circuit Judge.

The question for decision in the above case is whether the policy of the State of New Mexico and that of the City of Santa Fe, which permits the Indians to display and to sell their handcrafted jewelry, arts and crafts on the grounds of the Museum of New Mexico and the Palace of the Governors, and which prohibits any persons other than the Indians from offering for sale handcrafted jewelry and which specifically forbids sales by persons other than Indians within the Plaza, is valid.

Paul and Sara Livingston, the plaintiffs-appellants in this case, are non-Indians who seek to obtain a judgment authorizing them to sell jewelry in the area of the Museum and Palace of the Governors, which is assigned on an exclusive basis to the Indians.

On February 18, 1976, the Board of Regents of the New Mexico Museum at Santa Fe adopted a written policy providing for withdrawal of permission previously granted to display and sell merchandise on the grounds of the Museum with the exception of the area under the portal, which could be used solely by Indians to sell and display arts and crafts made by hand by Indian artists and craftsmen.

On April 2, 1976, the City of Santa Fe adopted a resolution prohibiting sales by persons other than Indians within 50 feet of

---

* Of the United States District Court for the District of Colorado, sitting by designation.

any established business offering for sale handcrafted jewelry.

The disposition of this case was by way of an order granting the summary judgment motion of the Director of the Museum and that of the Board of Regents of the Museum of Santa Fe, together with the Mayor, the Chief of Police of Santa Fe, and the Council members of Santa Fe among others. The individual Indians have intervened. An amicus brief has been filed by the All Indian Pueblo Council, Inc.

There exists no issue between the parties as to the facts, and since the plaintiffs-appellants also moved for summary judgment, no dispute exists as to the propriety of disposing of this case on summary judgment. The question is whether the trial court's decision granting summary judgment in favor of defendants-appellees was correct.

The trial court's memorandum and order states the issue in terms of whether the policies of the Museum and of the City "permitting only Indians to sell their handmade goods under the portal of the Palace of the Governors violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution."

The trial court in describing the contentions has said that the plaintiffs maintain that their rights under the Fourteenth Amendment have been violated. The defendants claim that there exists a rational basis for the policy which gives a preference to the intervening Indians who are craftspeople. In essence, the trial court said that the design of the program is to "enhance the ability of a distinctive cultural community to maintain their self-determination and lifestyle."

The history of the building in question goes back to the seventeenth century. It is said to be the oldest public building in the United States. The Pueblo Indians actually occupied it between 1680 and 1693. During this period they sold food and wares on the site of the house. After the reconquest by the Spanish, the area became a marketplace, and subsequently traders and businessmen established shops there. During the nineteenth century, several ethnic groups used the portal as a market, but by 1909, the non-Indian groups had abandoned it; only the Indian market remained.

The New Mexico legislature established the Museum in 1909, and since then the Indians have been a part of the Museum's program. In the interest of stimulating the native crafts and encouraging the educational consequences, the Board of the Museum was carrying out an educational policy to develop and preserve the traditions of New Mexico. In 1935, the Museum began to limit the space inside the portal to the Indians for the sale of their arts and crafts. An agreement was made between the Museum and the New Mexico Association of Indian Affairs to have a market under the portal. Although this market was discontinued during World War II, it was reestablished immediately thereafter and is now used during the entire year. Custom was changed to a more definite policy by the Regents in 1972. The Indians themselves allocate the space and maintain an orderly market. The program is not limited, however, to New Mexico Indians. It is used as well by Indians from other areas of the country. Disputes are resolved by the Director of the Museum.

The opinion of the trial court also emphasized that the Museum's effort has been to promote the traditional Indian arts and crafts and to prevent the influx of non-Indian substitutes and imitations. It is thought that only Indians can make Indian goods and, therefore, that it is in the public interest to allow the Indians to do it. The conclusion which the trial court reached is that it is permissible under the Constitution to promote a unique cultural effort such as the French Quarter in New Orleans and this Indian Market in Santa Fe. It is pointed out that Indians are protected by Art. I, § 8 of the Constitution, which grants to Congress exclusive power to regulate commerce with the Indian tribes. Likewise, the New Mexico Constitution, Art. 21, § 2, affords protection to Indian tribes.

## I.

### APPLICABILITY OF THE PREFERENCE STATUTE, 42 U.S.C. § 2000e–2(i)

A. *Consideration of the Supreme Court's Decision in Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)*

The leading United States Supreme Court decision on the subject of Indian preference is that in *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), wherein a not dissimilar attack was made on preferential hiring of Indians within the Bureau of Indian Affairs. The argument was that this was a classification which was invidious. The Supreme Court, however, rejected this argument, the three-judge district court had held that the Indian preferences were impliedly repealed by § 11 of the 1972 Equal Employment Opportunity Act. 42 U.S.C. § 2000e–16(a). The Supreme Court reversed. Its holding was that § 12 of the Indian Reorganization Act of 1934, 25 U.S.C. § 472, was not repealed, expressly or impliedly, by the Equal Employment Opportunity Act of 1972, which proscribed racial discrimination in federal employment.

The importance of the decision for our purpose is that the Supreme Court, in upholding the preference contained in the 1934 Act, placed it in perspective and recognized its object as being the giving to Indian tribes a greater degree of self-government both politically and economically. Congress, it was said, was seeking to modify a situation, whereby a non-Indian staffed agency exercised plenary control over the lives of the federally recognized Indian tribes. The overall purpose of the Act, it was pointed out, was to promote self-government within the tribes, and accomplishing these ends required the use of some degree of preference and exemption. The Court thus said, in effect, that the underlying purpose of the Act was to correct discrimination which had theretofore existed against the Indians.

Based upon this background, the Supreme Court rejected the contention of the appellees that there was a conflict between the Indian Reorganization Act of 1934 and of the Equal Employment Opportunity Act of 1972, which could be resolved only by holding that the 1972 Act impliedly repealed the 1934 exemptions. The opinion of Mr. Justice Blackmun was that the Congress had in the interim created exemptions excluding coverage of tribal employment and granting preferential treatment to a business or enterprise on or near a reservation in 42 U.S.C. § 2000e(b) and § 2000e–2(i). These were held to show a congressional intent that Indian preference in this context was not to be considered racial discrimination of the type generally proscribed. From the fact of the congressional intent expressed in the 1964 enactment not to repeal the preferences, it was held to be illogical to argue that there was an *implied* repudiation in 1972. Also pointed out was the fact that Congress passed at about this time two new Indian preference laws.[1]

The general conclusion of the Court was that the case turned on the unique legal status of Indians under federal law and upon the plenary power of Congress derived from a history of treaties and the assumption of guardian-ward status to legislate specially on behalf of Indian tribes. The long history of Indian preference legislation was said to be all a part of an effort by Congress to discharge its unique obligations to the Indians, which fully justified the legal preferences made.

In discussing the enactment of the 1964 preference provisions, 42 U.S.C. § 2000e(b) and § 2000e–2(i), as evidencing a congressional intent not to impliedly repeal exemptions, the Court said:

> These 1964 exemptions as to private employment indicate Congress' recognition of the longstanding federal policy of providing a unique legal status to Indians in matters concerning tribal or "on or near"

---

1. These enactments were in the 1972 Educational Amendments. *See* 20 U.S.C. §§ 887c(a) and (d), and 20 U.S.C. § 1119a.

reservation employment. The exemptions reveal a clear congressional sentiment that an Indian preference in the narrow context of tribal or reservation-related employment did not constitute racial discrimination of the type otherwise proscribed. In extending the general anti-discrimination machinery to federal employment in 1972, Congress in no way modified these private employment preferences built into the 1964 Act, and they are still in effect. It would be anomalous to conclude that Congress intended to eliminate the longstanding statutory preferences in BIA employment, as being racially discriminatory, at the very same time it was reaffirming the right of tribal and reservation-related private employers to provide Indian preference. Appellees' assertion that Congress implicitly repealed the preference as racially discriminatory, while retaining the 1964 preferences, attributes to Congress irrationality and arbitrariness, an attribution we do not share.

417 U.S. at 548, 94 S.Ct. at 2481.

The Supreme Court in *Mancari* also rejected the notion that the preference under attack in that case was in truth a preference. It called it an employment criterion. It said that Congress had sought only to authorize the BIA to draw more heavily from among the constituent group in staffing its projects, all of which, directly or indirectly, affect the lives of tribal Indians. It said that the preference was granted to Indians not as a discrete racial group, but, rather, as tribal entities whose lives and activities are governed by the BIA in a unique fashion. It said also that no other group of people has such a status.

In our opinion the Supreme Court's decision in *Morton v. Mancari, supra,* is a very strong precedent for upholding the grant of the exclusive right to the Indians in the present case based on the employment statute in § 2000e–2(i), which provides:

(i) Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.

The holding in *Mancari,* plus the background information which it provides, together with the Supreme Court's comments concerning the statute which we consider to be here applicable, provides strong support for the applicability of the statute to our facts.

### B. *Does the Relationship Between the Museum and the Indians Constitute an Employment Practice?*

It is urged by the Livingstons that the relationship between the Indians and the Museum does not constitute an employment practice within the meaning of § 2000e–2(i). Therefore, they contend that the statute does not apply.

In a strict sense the Indians are not servants of the Museum in a master-servant sense. For one thing, they are not paid a salary. It is more accurate to say that they are given a valuable concession much of which has been, however, developed by the Indians over a long period of time. The Indians, in addition, render a valuable service to the Museum by bringing tourists to the Square. Also, their presence attracts tourists to the public buildings and to the private shops.

Employment practice must be given a broad scope. It is not restricted to a servant situation. To give it such a narrow effect would thwart the entire effort and not allow the Indians to develop as entrepreneurs, and it would place them in a position of having to compete with Anglo businessmen and employ competitive practices, and would tend to sacrifice the educational and cultural object. The fact is that they are engaged in employment and the fact is that the Museum is the director of this employment, and there is every reason to regard this as an employment practice.

The District of Columbia Circuit in *Sibley Mem. Hospital v. Wilson,* 160 U.S.App.D.C. 14, 488 F.2d 1338 (1973), extended the Title

VII Act to a hospital which allowed private duty nurses to work on the premises. In that case the private duty nurse was employed by the patient and not the hospital, and yet the hospital was held responsible for the policy which allowed discrimination against male nurses. It thus extended the employment concept to a party, the hospital, which did not actually employ the complainant. *Id.* 160 U.S.App.D.C. at 17, 488 F.2d at 1341.

Similarly, the case of *Puntolillo v. New Hampshire Racing Comm'n*, 375 F.Supp. 1089 (D.N.H.1974), involved the granting of a concession by the Racing Association to driver trainers to work on its premises. It was held that the withholding of this concession on account of race violated the Act. It said that the defendants were employers within the meaning of 42 U.S.C. § 2000e(b) even though they did not pay the complainant who actually worked for a concessionaire.

C. *Is the Portal Area On or Near a Reservation Within the Meaning of the Statute?*

The wording of the Act, "on or near an Indian reservation" is fulfilled. Neither the particular area of the portal, as it is called, nor the City of Santa Fe, is on an Indian reservation. However, Santa Fe is said to be eight miles from an Indian pueblo and within a short distance of others, which include the ones from which the portal Indians come. The words "on or near a reservation" were specifically included in the Act so as to bring in Indians who had not been assimilated by nearby pueblos or tribes, but who maintain close ties with reservations in the community. So it would appear that the term "on or near" was included in the Act in order to give some scope and breadth to the statute. We see no problem in applying the statute to the portal Indians. Their proximity to the reservations is sufficient so as to bring them within the protection of the exemption or preference statutes. *See Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), which considers the term "on or near" in the context of welfare eligibility. The Court's interpretation was a liberal one.

## II.

### CLAIM OF REVERSE DISCRIMINATION.

In our opinion, the statute, 42 U.S.C. § 2000e–2(i), which has received favorable comment from the Supreme Court in *Mancari*, is fully applicable here and is dispositive of this case. If, however, this case were being considered as a possible constitutional violation, a reverse discrimination, it would be our conclusion that no such violation has been demonstrated, for the following reasons:

*First*, the effort of the Livingstons to show reverse discrimination within the meaning of the *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), fails. It is true that in *Bakke*, the Supreme Court, in the opinion of Justice Powell, applied the strict scrutiny test. Four Justices, however, rejected it because Bakke was not a member of a class that had any of the traditional aspects of a suspect group. Here, there was no facial, stigmatized discrimination against the white majority. Rather, the effort was to extend to the Indians privileges which they were peculiarly able to utilize in the promotion of educational and cultural objectives in which the state had a great interest.

*Second*, assuming that the burden is on the state to establish that the interest which it is advancing is a compelling one, we believe that the facts presented prove that there is a valuable state interest, that of acquiring, preserving and exhibiting historical, archeological and ethnological interests in fine arts. We would rule that the right claimed by the Livingstons is far outweighed by the educational, cultural and artistic interests which the state is fostering. If the Livingstons were to be granted relief and the condition were changed so as to create a general competitive condition, it would unquestionably render impossible the promotion and encouragement of the salutary objects which now obtain, that is, the

education of the public in the history and tradition of the area as well as the promotion of Indian arts and crafts. Thus, even if the matter were measured in accordance with the opinion of Mr. Justice Powell in *Bakke, supra,* the policies which are being pursued by the State of New Mexico would withstand the constitutional test.

One further observation: The Livingstons cannot say that there is anything in the nature of stigma which attaches to the classification, whereby the discrimination, if any, is invidious. Instead the permission given to the Indians is one element of a comprehensive program designed to allow the general public to meet the Indians and to gain information as to the character and quality of the Indians' work. We cannot agree that this effort constitutes invalid racial discrimination.

In conclusion, therefore, we hold that the Livingstons' case fails because Congress was fully justified in extending to the Indians the exemptions that are considered and favorably discussed in *Morton v. Mancari, supra.*

The judgment of the district court is affirmed.