ST. PAUL INTERTRIBAL HOUSING
BOARD, a Minnesota nonprofit
corporation, Plaintiff,

v.

William Bradford REYNOLDS, individual-
ly, and in his capacity as Assistant At-
torney General, Civil Rights Division,
United States Department of Justice;
Attorney General William French
Smith; the United States Department of
Justice; the United States Department
of Housing and Urban Development;
Samuel R. Pierce, Jr., Secretary, Thomas
T. Feeney, Minneapolis Area Manager
of the United States Department of
Housing and Urban Development; and
other defendants now unknown to the
plaintiff, Defendants.

Civ. No. 4–82–872.

United States District Court,
D. Minnesota,
Fourth Division.

May 31, 1983.

 

ants from withdrawing or suspending funding for the Board's project and from violating plaintiff's civil rights, damages from defendant William Bradford Reynolds, Assistant Attorney General, Civil Rights Division, and others unknown to it for allegedly depriving and conspiring to deprive plaintiff of its civil rights, and costs and attorneys' fees under 42 U.S.C. § 1988. Jurisdiction is alleged under 5 U.S.C. §§ 551, 701, 702, 705, and 28 U.S.C. §§ 1343, 2201 and 2202.

This matter now comes before the court on defendants' motion to dismiss or, in the alternative, for summary judgment, and on plaintiff's motion for summary judgment on its claim for declaratory relief.

## I. Factual Background

The Board is an organization of American Indians duly organized as a nonprofit corporation for the purpose of providing housing for Indians in the city of St. Paul. The Board is governed by Indian directors representing several different tribes. The program administrator, the only paid employee of the Board, is also an Indian.

In 1980, following extensive investigation into the housing needs of the St. Paul Indian community and into the alternatives available to meet those needs, the Board drew up a program for low income Indian families located within the city. The program would provide twenty-four detached rental housing units of three and four bedrooms on scattered sites. The units would be available to families whose head of household is an enrolled member of a federally recognized tribe.

The Board approached both the Minnesota Housing Finance Agency (the Agency) and the St. Paul Public Housing Agency (PHA) for funding of its program.[1] The Agency was created in 1971 to facilitate the construction and rehabilitation of housing projects for families of low and moderate income. Minn.Stat. § 462A.01 et seq. The Minnesota Urban Indian Housing Act (the

Larry B. Leventhal, Leventhal & Associates, Minneapolis, Minn., for plaintiff.

Catherine H. Coleman, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

This action for declaratory and injunctive relief and monetary damages was brought by plaintiff St. Paul Intertribal Housing Board (the Board), a non-profit Minnesota corporation, against the defendant federal government agencies and officers. Plaintiff seeks a declaration that there is no legal impediment to the use of funds from the Department of Housing and Urban Development (HUD) Section 8 Moderate Rehabilitation Housing Program (HUD Program) in the Board's urban Indian housing project, injunctive relief restraining defend-

---

1. In addition, plaintiff states that rehabilitation components of the program will be financed and sponsored by the Planning and Economic Development Agency of the City of St. Paul; Mayor George Latimer has committed financing for rehabilitation.

Act) authorizes the Agency to engage in housing programs for American Indians residing in the Minneapolis-St. Paul area or other cities in the state with a population of more than 50,000. Minn.Stat. § 462A.07, subd. 14 and 15. The Act authorizes programs for construction, purchase, and rehabilitation of housing and seeks innovative methods of providing urban Indian housing. The Act also requires that, to the extent possible, the programs come up with funds from other public and private sources in addition to the state appropriation. The proposal submitted by the Board called for the Agency to loan it legislatively-appropriated Indian housing money for property acquisition.

PHA was formed in 1977 and is operated by a seven person commission appointed by the mayor. Its mission is to provide a range of affordable rental housing opportunities to eligible low income and elderly residents, and it administers several federal rental assistance programs including HUD Program funds. The proposal submitted by the Board called for PHA to commit HUD Program funds to its program.

On or about October 16, 1980, the Advisory Council on Urban Indians for the State Indian Affairs Intertribal Board recommended that the Agency fund the Board's proposal, calling it a well-written, well-researched program. Subsequently, the Agency approved the program and agreed to loan $720,000.00 of state funds to the Board. PHA's assurance that HUD Program subsidies would be available for the Board's plan was a condition of approval by the Agency.

PHA approved the Board's program on December 3, 1980. It reserved twenty-four HUD Program unit assignments for its use. The PHA commissioners noted, however, that potential legal problems were raised by a project open only to Indians and recommended HUD review the question. Implementation of the Board's program was blocked when HUD took the position that Title VI of the Civil Rights Act of 1964 and Title VIII of the Civil Rights Act of 1968 prohibited the use of HUD Program funds in the Board's project because it featured an impermissible racial preference. Up to this point the parties agree on the factual background, but they disagree on facts related to the role of defendant Reynolds.

According to defendants, HUD officials sought an opinion from the Justice's Department's Civil Rights Division on the question of whether Title VI and Title VIII prohibited the use of HUD Program funds for the Board's project. After the Division had done some initial, inconclusive research, Reynolds had the question referred to the Justice Department's Office of Legal Counsel (OLC). Defendants state that on June 8, 1982, OLC completed its opinion on the question of whether a private HUD Program project owner (rather than an Indian Housing Authority) could restrict tenant eligibility to Indians only. OLC concluded that the Board's program was not the type of Indian preference that courts had recognized as permissible and that the tenant eligibility restriction on its face violated Titles VI and VIII. The Justice Department then sent the OLC opinion to HUD on or about June 28, 1982. Defendants support their version of the facts with the affidavits of Reynolds and Daniel Searing, a staff attorney in the Coordination and Review Section of the Civil Rights Division.

The Board claims, however, that HUD referred the question of the legality of utilizing federal funds for the Board's housing program to the Department of Justice, Civil Rights Division, Office of Coordination and Review in late 1980 or early 1981. The Board asserts that in the middle or latter part of 1981, the Section of Coordination and Review researched and completed an opinion which has been withheld solely as a result of actions by defendant Reynolds who directed that a contrary opinion be prepared. Plaintiff alleges Reynolds' actions resulted from bias and prejudice and were without legal justification.

## II. Discussion

### A. Claim for Declaratory Relief

■ The parties agree that a special trust relationship or guardian-ward relationship exists between the federal government and Indians. When special or preferential treatment is reasonable and rational-

ly related to the fulfillment of the special trust obligation to Indians, it is permissible differentiation in legitimate public interest rather than prohibited racial discrimination. *See Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

Defendants argue that the trust doctrine does not apply to the Board's program because there is not evidence of legislative intent to support such a program in the statutes involved and because the doctrine is meant only to protect the quasi-sovereign status of tribes as political entities and to promote political self-determination. They claim the Board's program benefits individual, off-reservation Indians rather than facilitating self-determination.

The Board argues on the other hand that sufficient legislative intent to provide funds for urban Indian housing can be found in both the federal and state legislation involved and that the scope of the trust doctrine is broad enough to include housing programs for the benefit of individual urban Indians.

*(1) Legislative Intent*

██ In order for an Indian preference program to fall within the trust doctrine and thus not be racially discriminatory, there must be an expression of legislative intent to benefit Indians in such manner. *See Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir.1975); *Eric v. Secretary of HUD,* 464 F.Supp. 44 (D.Alaska 1978). Although the trust doctrine must be based on a statute, the doctrine is not limited by statute but by common law trust principles.[2] *Eric v. Secretary of HUD,* 464 F.Supp. 44 (D.Alaska, 1978). *See also United States v. Mason,* 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973); *Seminole Nation v. United States,* 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); *Manchester Band of Pomo Indians, Inc. v. United States,* 363 F.Supp. 1238 (N.D.Cal. 1973). Thus, if Congress expressed an intent to benefit off-reservation Indians in the United States Housing Act of 1937[3] which now covers the HUD Program, the

intended effect may be determined by application of common law trust principles.

The Housing Act of 1937 (the Housing Act) evidences congressional intent to provide funds for Indian housing. It authorizes the Secretary of HUD to make contributions to public housing agencies. 42 U.S.C. § 1437c(a). A public housing agency is defined as including any state. 42 U.S.C. § 1437a(b)(6). Since the definition of state includes Indian tribes, bands, and groups, 42 U.S.C. § 1437a(b)(7), an Indian tribe or group is eligible for housing funds generally. Several other aspects of the Housing Act also pertain to Indians. *See* 42 U.S.C. §§ 1467, 1468, 1468a.

In 1974 Congress also enacted a three-year program which set aside certain housing program funds for low-income Indian families. 42 U.S.C. § 1437c(c). This version of 42 U.S.C. § 1437c(c) authorized the Secretary of HUD to "enter into contracts for annual contributions ... to assist in financing the development or acquisition cost of low-income housing for families who are members of any Indian tribe, band, pueblo, group or community of Indians or Alaska natives which is recognized by the Federal Government." This provision does not distinguish between urban and reservation Indians and does not require that the money be administered by a tribal housing authority or tribal government. The focus is on families rather than tribes.

Defendants agree that section 1437c(c) expressed congressional intent to benefit off-reservation Indians, but they point out that the section expressly excluded use of HUD Program funds from the set-aside program, the funds for which expired in 1976. Defendants also apparently conclude that the elimination of the set-aside plan in 1980 evidences an intent to withdraw any benefit to off-reservation Indian housing.

██ The court must disagree with defendants' conclusion in light of the applicable standard and the legislative history of section 1437c(c). It is well established that statutes passed for the benefit of Indians

---

**2.** The trust doctrine may also be based on a treaty, but such basis is not argued here.

**3.** 42 U.S.C. § 1401 *et seq.*

must be liberally construed in their favor. *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). Moreover, any Congressional action limiting or eliminating such a statutory right must be plain and unambiguous and construed narrowly:

> Once ... Indian rights are shown to exist, by treaty or otherwise, later federal action which might arguably abridge them is construed narrowly in favor of retaining Indian rights. The principle of a "clear and plain statement" before Indian treaty rights can be abrogated also applies in non-treaty contexts.

F. Cohen, Handbook on Federal Indian Law, p. 224 (1982 ed.). *See also Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir.1975).

The legislative history behind the abandonment of the section 1437c(c) set-aside program indicates that Congress did not mean to withdraw or limit its expression of intent to benefit Indians in the Housing Act. As defendants recognize, the 1980 amendment to section 1437c(c) was meant to give the Secretary of HUD greater discretion in terms of funding sources:

> Deletion of the set-asides would provide the Secretary maximum flexibility in utilizing the funds made available for public housing and Section 8 housing assistance payments.

S.Rep. No. 95–871, 95th Cong., 2d Sess. 14, 73 (1978), U.S.Code Cong. & Admin.News 1978, p. 4773, 4787. This is not a clear and plain statement of congressional intent to withdraw its earlier desire to assist Indian housing development. A more logical interpretation, and one which this court must adopt in construing the amendment narrowly, is that the change was made to give the Secretary more discretion to utilize all funds, including HUD Program funds, to fulfill Congress' continuing intent to provide for Indian housing.

Although HUD now argues that there is insufficient expression of congressional intent to benefit off-reservation Indians in the Housing Act of 1937, it apparently reached the opposite conclusion in establishing its own Indian preference programs which can extend to urban Indians—the Indian Housing Programs and Indian Housing Authorities. 24 C.F.R. § 805.101 *et seq.* HUD cites several sections of the Housing Act as authority for the promulgation of Indian Housing Program regulations,[4] but only one, 42 U.S.C. § 1437c(c), specifically mentions Indians. The Board's more extensive showing of congressional intent to benefit Indians in the Housing Act is sufficient to establish that Indian preference programs relying on that Act fall under the trust doctrine.

█ State action for the benefit of Indians can also fall under the trust doctrine and therefore be protected from challenge under the equal protection clause or civil rights statutes.[5] *See Washington v. Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *Livingston v. Ewing,* 601 F.2d 1110 (10th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 147, 62 L.Ed.2d 95 (1979). *See also Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir.1975); *Anderson v. O'Brien,* 84 Wash.2d 64, 524 P.2d 390 (1974); *Prince v. Board of Education,* 88 N.M. 548, 543 P.2d 1176 (1976). In *Washington v. Fishing Vessel Ass'n* the Supreme Court summarily rejected arguments that state fishing regulations protecting Indian treaty rights violated equal protection laws. The Court reasoned that special treatment on behalf of Indians is justified where rationally related to "*Government's* 'unique obligation toward the Indians'". 443 U.S. at 673 n. 20, 99 S.Ct. at 3068 n. 20, citing *Morton v. Mancari,* 417 U.S. at 555, 94 S.Ct. at 2485 [emphasis added].[6] Similarly, in *Livingston v.*

---

4. 24 C.F.R. Part 805, revised as of April 1, 1982, cites the following as "Authority": 42 U.S.C. 3535(d); 42 U.S.C. 1437, note and 1437f, note; 42 U.S.C. 1437 et seq., especially 42 U.S.C. §§ 1437c(b), (c), and (h).

5. The state action must not interfere with tribal government or federal programs, however, and

must be rationally related to governmental functions and obligations under the trust doctrine.

6. The original passage in *Morton v. Mancari* referred to "Congress' unique obligation", while the passage above refers to a more general obligation of the government. Taken in con-

*Ewing* the Tenth Circuit upheld a state policy which extended a social welfare benefit only to American Indians.

■ The Minnesota Legislature has expressed its clear intention to benefit urban Indians in the Minnesota Urban Indian Housing Act. Minn.Stat. § 462A.07, subd. 15. This special treatment is rationally related to government's unique obligation to the Indians and thus falls under the trust doctrine. Consequently, HUD is not barred by the equal protection clause or civil rights statutes from providing HUD Program funds to programs approved under this legislation.

### (2) Scope of the Trust Doctrine

According to defendants, the trust doctrine is meant only to protect the quasi-sovereign status of tribes as political entities and to promote political self-determination. HUD's own Indian Housing Programs are said to come within the scope of the trust doctrine because they are only available to Indian Housing Authorities which are political bodies. The Board's program, on the other hand, deals with individual, off-reservation Indians and is unrelated to the political sovereignty of Indians. Thus it falls outside of the trust doctrine and violates the civil rights statutes, defendants conclude.

Defendants' analysis of the scope of the trust doctrine underestimates the obligation owed to Indians. The trust relationship between the United States and the Indians is broad and far reaching, ranging from protection of treaty rights to the provision of social welfare benefits, including housing. The history of the treatment of Indians by the United States justifies this interpretation of the trust relationship, and the case law and legislative background support it.

The broad scope of the trust doctrine was established by Justice Marshall in *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831).

[Indians] are in a state of pupilcy; their relation to the United States resembles that of a ward to his guardian. They

text it indicates that the trust relation extends

look to our government for protection; rely upon its kindness and its power; appeal to it for relief of their wants …

30 U.S. at 17. In *Morton v. Mancari,* 417 U.S. 535, 541–42, 94 S.Ct. 2474, 2478, 41 L.Ed.2d 290 (1973), while discussing the trust doctrine and Indian preference statutes under it, the Court noted that a purpose of the preferences has been "to further the Government's trust obligation toward the Indian tribes". The footnote to this last phrase reads in its entirety:

A letter, contained in the House Report to the 1934 Act, from President F.D. Roosevelt to Congressman Howard states: "We can and should, without further delay, extend to the Indian the fundamental rights of political liberty and local self-government and the opportunities of education and economic assistance that they require in order to attain a wholesome American life. This is but the obligation of honor of a powerful nation toward a people living among us and dependent upon our protection." H.R.Rep. No. 1804, 73d Con., 2d Sess., 8 (1934).

417 U.S. at 542 n. 10, 94 S.Ct. at 2478 n. 10. *See also Eric v. Secretary of HUD,* 464 F.Supp. 44 (D.Alaska 1978).

Further evidence of the scope of the trust doctrine is found in the Final Report of the American Indian Policy Review Commission, established by Congress in 1975 to conduct a comprehensive review of the historical and legal developments underlying the Indians' unique relation to the United States. *See* 25 U.S.C. § 174. The Commission summarized the origin and basis of the trust doctrine in its Final Report as follows:

The Federal trust responsibility emanates from the unique relationship between the United States and Indians in which the Federal Government undertook the obligation to insure the survival of Indian tribes. It has its genesis in international law, colonial and U.S. treaties, agreements, Federal statutes and Federal judicial decisions. It is a "duty of protection" which arose because of the "weakness and helplessness" of Indian tribes "so

to the states.

largely due to the course of dealings of the Federal Government with them and the treaties in which it has been promised * * *." Its broad purposes, as revealed by a thoughtful reading of the various legal sources, is to protect and enhance the people, the property and the self-government of Indian Tribes. (Footnotes omitted).

Vol. I, American Indian Policy Review Commission Final Report, p. 126 (submitted to Congress May 17, 1977). Provision for housing is well within the spirit of the trust doctrine as defined above.

In light of the broad scope of the trust doctrine, it is not surprising that it can extend to Indians individually, as well as collectively, and off the reservation, as well as on it. See Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); Morton v. Ruiz, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); [7] McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); Livingston v. Ewing, 601 F.2d 1110 (10th Cir.), cert. denied, 444 U.S. 870, 100 S.Ct. 147, 62 L.Ed.2d 95 (1979); Eric v. Secretary of HUD, 464 F.Supp. 44 (D.Alaska 1978). See also the Snyder Act, 25 U.S.C. § 13.[8]

The Eric case is very similar to that before the court. Eric involved a statute which provided housing funds primarily for Alaskan Indians and Natives. There was no limitation in the statute to Indians on or near reservations. HUD argued that the statute was not within the trust doctrine, but the court rejected that argument.[9] The court specifically held that the trust doctrine applies between the government and individual Alaska Natives or Indians and to housing programs which involve "off-reservation gratuities". 464 F.Supp. at 49, citing Morton v. Ruiz, 415 U.S. 199, 236, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974).

Finally, defendants are wrong when they argue that the Board's program will not further goals of self-determination or sovereignty. The Board's program would support Indian self-determination by assuring Indian participation in the direction of housing services to the urban Indian community. See 25 U.S.C. § 450a. Tribes in their quasi-sovereign status will be benefited by the Board's program, a fact recognized by several tribal governments as evidenced by their resolutions in support of the program.[10] Moreover, just as in most of the cases cited above, the Board's program will benefit the self-determination of Indian individuals and tribes by increasing the available alternatives open to Indians in American society.

■ As the history of the trust doctrine shows, the doctrine is not static and sharply delineated, but rather is a flexible doctrine which has changed and adapted to meet the changing needs of the Indian community.[11] This is to be expected in the development of any guardian-ward relationship. The increasing urbanization of American Indians

---

7. In Ruiz the Court declared that the overriding duty of the Federal Government to deal fairly with Indians wherever located had been recognized on many occasions. 415 U.S. at 236. It noted that social welfare benefits may apply off the reservation and that an administrative agency should not arbitrarily limit its program to the reservation:

It is to be noted that neither the language of the Snyder Act nor that of the Appropriations Act imposes any geographical limitation on the availability of general assistance benefits and does not prescribe eligibility requirements or the details of any program. 415 U.S. at 207, 94 S.Ct. at 1061. In the case before the court there is a similar lack of expressed Congressional intent to limit the benefits for Indian housing assistance to the reservation.

8. The Board also cites other cases and programs under which benefits were extended to individuals, including scholarship programs under 25 C.F.R. § 32.1 and loans for economic development under 25 C.F.R. § 91.

9. "The trust doctrine is not limited to situations in which the government is managing property owned by an Indian tribe as defendants contend." 464 F.Supp. at 49.

10. See exhibits N3–N5 attached to plaintiff's complaint.

11. See also exhibit J, pp. 6–17, attached to the Board's complaint.

has created new problems for Indian tribes and tribal members. One of the most acute is the need for adequate urban housing. Both Congress and the Minnesota Legislature have recognized this. The Board's program, as adopted by the Agency, is an Indian created and supported approach to Indian housing problems. This court must conclude that the program falls within the scope of the trust doctrine and that plaintiff is entitled to summary judgment on its claim for declaratory relief.[12]

### B. Civil Rights Claim

The Board argues that genuine issues of material fact exist concerning its civil rights claim against defendant Reynolds which preclude summary judgment. Reynolds relies on *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), to assert that he has qualified immunity from the civil rights claim, thereby making summary judgment appropriate.

■ The court finds that summary judgment in favor of defendant Reynolds is required under the *Harlow* objective test for qualified immunity.[13] Under *Harlow,* the issue is whether the defendant violated statutory or constitutional rights which were clearly established at the time and which a reasonable person would have known.[14] The law relating to the use of HUD Program funds in the Board's program was far from clearly established when HUD denied use of the funds. Thus, even if Reynolds acted as the Board alleges he acted, summary judgment in his favor would be appropriate under *Harlow.*

Accordingly, based upon the above and all the files, records, and proceedings herein,

IT IS HEREBY ORDERED AND ADJUDGED:

1. That plaintiff's motion for summary judgment on its claim for declaratory relief is granted and it is hereby declared that no legal or constitutional impediment exists to prohibit the utilization of HUD Section 8 Moderate Rehabilitation Housing Program funds in plaintiff's housing project as approved and funded by the Minnesota Housing Finance Agency.

2. That defendant Reynolds' motion for summary judgment on plaintiff's civil rights claim is granted, and the civil rights claim is dismissed.

3. That the parties show cause in writing, no later than June 10, 1983, why final judgment should not now be entered herein in plaintiff's favor.

---

**12.** Since plaintiff also sought injunctive relief in its complaint and that claim for relief has not been advanced on the motion for summary judgment, entry of final judgment may be premature, however. *See* Rule 54(b) of the Federal Rules of Civil Procedure.

**13.** Because affidavits on this motion have been submitted, this motion is treated as one for summary judgment under Rule 56 and not as a motion to dismiss under Rule 12(b)(6).

**14.** The Court explained:
Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed.
102 S.Ct. at 2739.