**Wilbur TOLEDO, Plaintiff,**

v.

**NOBEL–SYSCO, INC., Defendant.**

**No. 85–618–M Civ.**

United States District Court,
D. New Mexico.

April 2, 1986.

On Motion for Review of Costs
July 2, 1986.

Robert B. Turner (co-counsel), Stephen T.
Lecuyer (lead counsel), DNA–People's Le-

gal Service, Inc., Shiprock, N.M., for plaintiff.

Jeffrey Twersky, Modrall, Sperling, Roehl, Harris & Sisk, Peter J. Adang, Albuquerque, N.M., for defendant.

## MEMORANDUM OPINION AND ORDER

MECHEM, Senior District Judge.

This case came on for bench trial on February 24 and 25, 1986. This opinion constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

The controversy arises under the religious discrimination provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e(j) and 2000e-2(a). This court has jurisdiction over the parties and the subject matter of this action.

This is a case of first impression. The plaintiff, Wilbur Toledo (Toledo), claims religious discrimination in employment by the defendant, Nobel-Sysco, Inc. (Nobel). His claim is based on Nobel's refusal to hire him as a truck driver because of his use of peyote, a hallucinogenic drug, in religious ceremonies of the Native American Church (Church). The question is whether an employer's duty to accommodate an employee's religious practices extends to hiring a truck driver whose religious practices may present a safety hazard to the public.

### I. Facts

Toledo is an enrolled member of the Navajo Tribe and lives in or near Farmington, New Mexico. He joined the Church in 1983. Since that time and until the time of trial, Toledo participated in about ten peyote services of the Church. He joined the Church to seek help with an alcohol problem and has not had a drink of alcohol since that time. Toledo ate and drank peyote at these services. Services are not held at regular times, but are held whenever a member needs healing or calls a service for another reason. The services Toledo attended were always held on Friday or Saturday nights.

Nobel is a restaurant supply corporation that distributes food, supplies and equipment to customers in Wyoming, Colorado, New Mexico and parts of Arizona. Nobel's Albuquerque office services customers in New Mexico, Southwestern Colorado and Arizona.

On February 29, 1984, Toledo responded to a newspaper advertisement and applied with Nobel for a truck-driving position known as a "domiciled delivery driver". Nobel was seeking a driver domiciled in Farmington who was an experienced tractor-trailer driver with mountain driving experience. The driver was required to pick up loaded trailers in Farmington, drive the 18 wheel tractor-trailer on mountainous roads, and deliver the contents to restaurants in the nearby towns of northern New Mexico and southern Colorado. Other drivers moved the trailers back and forth between Albuquerque and Farmington. The domiciled delivery driver was expected to work six days a week, normally Monday through Saturday, but was to be available to work seven days a week. Nobel occasionally had loads to be delivered out of Farmington on Sundays. Nobel employed three domiciled delivery drivers in Farmington. There was no supervision of these delivery drivers in Farmington.

Nobel called Toledo to come to Albuquerque for an interview. The interview was conducted by Rodney Plagmann, Nobel's office manager at Nobel offices on March 13, 1984. Plagmann told Toledo that he had the necessary experience for the job and that he would be hired if he passed the four tests that Nobel routinely administers to driver applicants. One was a polygraph test which Nobel administered to determine an applicant's truthfulness regarding use of illegal drugs in the last two years. Plagmann explained Nobel's policy of not hiring drivers who had used illegal drugs in the last two years. This requirement of the job had been stated in the newspaper advertisement and the information sheet sent to Toledo with the application blank.

At the end of the interview, Toledo disclosed to Plagmann that he used peyote in religious ceremonies of the Church. Tole-

do described the healing purpose of the ceremonies. Toledo stated that he had used peyote about twice in the preceding six months, or "whenever a group of us gets together." Plagmann did not inquire further regarding the frequency, timing or nature of Toledo's use of peyote, and Toledo did not elaborate.

Plagmann considered peyote to be an illegal drug, so while Toledo took the Minnesota Clerical Test, Plagmann called Nobel's personnel director, James Etherton, in Denver, for advice. Etherton did not know much about the properties of peyote, nor whether religious use of peyote by Church members was legal. Etherton in turn called Mr. Moore of Mountain States Employers Council, Nobel's labor relations adviser. Moore was not a lawyer, but he had lawyers working for him. Moore told Etherton that it was legal for Church members to use peyote in religious ceremonies, but that hiring a known user of peyote would open Nobel to potential liability if the driver was involved in an accident in the course of his employment. Based on this conversation, Etherton recommended to Plagmann that he not hire Toledo because of Toledo's use of peyote. Plagmann told Toledo that Nobel would not hire him because of this use. Plagmann did not administer the polygraph test to determine if Toledo made any nonreligious use of illegal drugs, nor did he offer any accommodation for Toledo's religious practice.

On March 19, 1984, Toledo filed a charge of unlawful discrimination with the New Mexico Human Rights Commission (NMHRC). He stated there that he used peyote "only when needed and only at one to two times per year." The NMHRC forwarded the charge to the Equal Employment Opportunity Commission (EEOC), and on April 6, 1984, the EEOC referred the charge back to the NMHRC. On April 10, Toledo signed a request that the EEOC and the NMHRC process his charge in accordance with Title VII and their work-sharing agreement.

In April, the parties or their lawyers exchanged letters indicating that each side was willing to entertain settlement offers. On May 17, 1984, Nobel made Toledo an offer through Patricia Gonzales, a mediator at the NMHRC, at her request. The terms were that Nobel would hire Toledo if he took the polygraph test and it showed no use of illegal drugs other than religious use of peyote twice a year, and if he would take one week of his regular vacation after each of his two uses per year of peyote. If the polygraph test showed use of other drugs or use of peyote more than twice a year or deception in other areas, Toledo would drop his complaint with the NMHRC. The offer did not include back pay. Toledo verbally rejected the offer, and made no counter offer.

On May 24, 1984, the NMHRC issued a decision that probable cause existed to believe that religious discrimination had occurred.

On July 10, 1984, Nobel amended the offer verbally to another staff member at the NMHRC. The relevant changes were that Toledo would be required to give one week's notice of his use of peyote and not work the day after using peyote, instead of taking one week's vacation after each use; the job would be based in Albuquerque, where he could be supervised; and the offer included $500 in back pay. Toledo rejected the offer because he believed that Nobel would use the polygraph test, physical exam, and road test to unjustly disqualify him as an excuse not to hire him; because the $500 back pay offer was too low; and because he objected to revealing the timing of his peyote ceremonies. Toledo did not make a counter offer. Toledo's position was, and still is, that he should be hired as a truck driver with no restriction on his use of peyote in religious ceremonies.

Peyote is a small, spineless cactus that grows in the Rio Grande valley of Texas and northern Mexico. Its scientific name is *Lophophora williumsii*. Native American religious use of peyote was discovered by Spanish explorers in the 1600's, and has continued to the present. It was documented among the Cherokees in the

1800's. Peyote use exists today among about 50 tribes in the United States.

Native religious use of peyote was first declared illegal in the 1600's, and efforts to ban religious use of peyote have been made since that time. The Church was established in 1918 in Oklahoma and has since spread through the country, and exists among the Navajo today. It is simply a corporate form for the preexisting peyote religion and it did not change the peyote religion's practices or beliefs.

Church peyote users believe that peyote is a sacred and powerful plant. Peyote is seen as a medicine, a protector, and a teacher. In terms used by other religions, peyote can be called a sacrament, something which when eaten gives awareness of God. The use of peyote is central to the Native American peyote religion. The religion teaches that those who use peyote must not use alcohol. It encourages love of parents and obedience to parents, fidelity to a spouse, and charity towards others. The peyote religion does not prohibit members from also practicing other religions.

Peyote ceremonies are held upon request for healing, to honor a person, or to send someone away or welcome them home. They can be held on any night of the week, but are generally held on Friday or Saturday nights.

The ceremonies which Toledo attends are generally attended by 15 to 20 people. They are held in a hogan or tepee. A Road Man directs each ceremony. The ceremony progresses through ritualistic stages, including singing, praying, drumming, lighting and burning a fire, and passing and drinking cups of water with floating peyote buttons in them. The peyote cups are generally passed twice, both times before midnight. Midnight marks a dividing point in the ceremony. Singing, praying and drumming continue until dawn. The participants stay awake all night and the next day. Toledo would usually go to sleep at about 4:00 or 5:00 P.M. on Sunday if it was a Saturday night ceremony, and sleep until his normal waking time on Monday morning. This gave him twelve or more hours of sleep.

If Toledo was a participant in a ceremony for another's benefit, he would usually take peyote only on the first pass. If he had called a ceremony, he would take peyote on both passes. His intake, therefore, varied from one to four cups of liquid per ceremony, each cupful containing four to six buttons of peyote. Peyote buttons are slices of the peyote cactus about the size of a quarter. They are chewed up and swallowed. The major psychoactive alkaloid in peyote is mescaline. An average button contains 20 to 45 milligrams (mg.) of mescaline. Toledo weighed 245 pounds or 110 kilograms (kg.). Assuming an average 35 mg. of mescaline per button and five buttons per cup, Toledo's dose could have ranged from 1.6 mg. of mescaline per kg. of body weight (one cup with five buttons) to 6.4 mg. of mescaline per kg. of body weight (four cups with five buttons each, or twenty buttons).

Doses of one to three mg. of mescaline per kg. of body weight are known to produce illusions, or sensory distortions. Doses of 5 mg./kg. are known to produce hallucinations, or sensations of things which do not in fact exist. Other general psychological effects include mood elevation, creating a sense of contentment or well-being, introspection, depersonalization (feeling detached from oneself), and an altered time sense.

Toledo testified that the effects of peyote for him usually last three to four hours. Experts testified that the effects could last up to twelve hours after ingestion, and peyote could be found in the body up to twenty-four hours after ingestion. Reactivation experiences, which are psychological sensations reliving what was sensed when under the influence of peyote, have been recorded as long as 36 hours after ingestion. Toledo has never had a reactivation experience. The experts agreed that a peyote user should not drive a truck for about 24 hours after ingesting peyote in amounts greater than one mg. of mescaline per kg. of body weight.

## II. Toledo's Prima Facie Case

■ 42 U.S.C. § 2000e–2(a) states that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire ... any individual ... because of such individual's ... religion...." A plaintiff makes out a *prima facie* case of religious discrimination in hiring if he proves that he has a *bona fide* religious belief or practice that conflicts with an employment requirement, that he informed the employer of this belief or practice, and that he was not hired because he could not comply with the conflicting employment requirement. *See Turpen v. Missouri-Kansas-Texas R.R.*, 736 F.2d 1022, 1026 (5th Cir.1984).

The parties have stipulated that the Church is a religion, and that the members' use of peyote is a religious use. Toledo proved that his own use of peyote was a sincere religious use. Toledo carries a Church membership card. He testified that he only used peyote in the ceremonies of the Church, and never used it on his own outside of religious services.

The conflict between Toledo's peyote use and Nobel's policy of not hiring truck drivers who use illegal drugs or have used them in the last two years was made clear at Toledo's interview with Plagmann. Toledo informed Nobel of his religious use of peyote. Nobel refused to hire him because his religious practice conflicted with an employment requirement.

■ Toledo has carried his burden of proof in proving a *prima facie* case of religious discrimination in hiring.

## III. Nobel's Defenses

42 U.S.C. § 2000e(j) defines the term religion. In conjunction with § 2000e–2(a), subsection (j) requires that an employer not discriminate against any religious observance, practice or belief "unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Nobel first claims that it

could not have made any accommodation to Toledo's religious practice without undue hardship. Nobel then claims that if it was required to accommodate, then its accommodation offers of May 17 and July 10, 1984, were reasonable. I conclude that Nobel could have accommodated Toledo's religious practice without undue hardship by restricting his practice slightly, and that the accommodation offer of July 10, 1984, was reasonable. To require more accommodation and less restriction would bring about undue hardship.

*A. Undue Hardship.* Nobel clearly did not make any effort to accommodate Toledo before refusing to hire him on March 13, 1984. Nobel now claims that it did not need to make any effort to accommodate because any accommodation would have imposed undue hardship. Toledo argues that an employer cannot claim the defense of undue hardship without first showing some effort at accommodation. Otherwise, the claim of undue hardship is pure speculation. The cases are unclear on this issue.

The Tenth Circuit has held both that an employer must first show some effort at accommodation and then show that further accommodation would result in undue hardship, *U.S. v. City of Albuquerque*, 545 F.2d 110, 113 (10th Cir.1976), *cert. denied* 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1092 (1977); *Williams v. So. Union Gas Co.*, 529 F.2d 483, 488–89 (10th Cir.1976), *cert. denied* 429 U.S. 959, 97 S.Ct. 381, 50 L.Ed.2d 325 (1976), and that an employer can claim undue hardship without showing any effort to accommodate. *Pinsker v. Joint Dist. No. 28 J*, 735 F.2d 388, 390 (10th Cir.1984); citing *McDaniel v. Essex Intern'l, Inc.*, 571 F.2d 338, 341 (6th Cir. 1978).

■ The Tenth Circuit's statement in *Pinsker* should control here. "Simply put, Title VII requires reasonable accommodation *or* a showing that reasonable accommodation would be an undue hardship on the employer." *Pinsker* at 390 (emphasis supplied). The plain words of the statute require that an employer demonstrate that he is *unable* to do something without un-

due hardship. By proving undue hardship in taking any action, the employer has shown that he is unable to take any action, thus complying with the statute. To require the employer to make some attempt at reasonable accommodation when any action would result in undue hardship, is to require a futile act. The facts in this case clearly warrant consideration of Nobel's defenses despite its failure to make any attempt at accommodation on March 13, 1984.

First, Nobel raises three related reasons why hiring Toledo under any circumstance would be undue hardship. It argues that a Department of Transportation (DOT) regulation, the Nobel drug policy and the Nobel lease agreement with Ryder Truck Rental, Inc. all prohibit hiring a driver who uses illegal drugs. All three arguments can be disposed of by the understanding that Toledo's use of peyote in religious ceremonies does not constitute use of an illegal drug.

The DOT regulation, 49 C.F.R. § 392.4 (1983), which was in effect on March 13, 1984, stated:

(a) No person shall operate, or be in physical control of, a motor vehicle if he possesses, is under the influence of, or is using, any of the following substances:
(1) A narcotic drug or any derivative thereof;
(2) An amphetamine or any formulation thereof (including, but not limited to "pep pills" and "bennies");
(3) Any other substance, to a degree which renders him incapable of safely operating a motor vehicle.

Sections 392.1 and 392.4(b) require a motor carrier to comply with these rules and not permit its drivers to violate them. Presumably these sections make a carrier liable to DOT regulatory sanction if it allows its drivers to violate these rules.

Peyote is neither a narcotic (it is not addictive) nor an amphetamine nor any derivative or formulation thereof. It is a hallucinogen. Therefore it is addressed under subsection (a)(3), a substance which can render a driver incapable of safely operating a truck. I interpret the regulation to

prohibit possession, driving under the influence of, or use (consumption) of peyote while operating or physically controlling a truck. It does not prohibit use or possession while off duty. Toledo testified that he never possessed or used peyote outside of Church ceremonies. Therefore, the only prohibited activity is for Toledo to drive a truck under the influence of peyote. Toledo could present a significant safety hazard if he were to drive a tractor-trailer truck under the influence of peyote.

But Nobel could have hired Toledo and not violated the rule if it had simply insured that Toledo would not drive while under the influence of peyote. It did this adequately in its accommodation offer of July 10, 1984, by providing that Toledo take one day off after each use of peyote. Nobel therefore could have reasonably accommodated Toledo without the undue hardship of being forced to violate the DOT regulation.

Although the above-quoted version of 49 C.F.R. § 392.4 was in effect in March, 1984, a change had been proposed in November, 1980. 45 Fed.Reg. 77470 (1980). The trucking industry was aware of the proposed change. The proposed version went into effect on December 5, 1984. 49 Fed.Reg. 44215 (1984).

The amended version of § 392.4 changed the wording of subsection (a) to read "no driver shall be on duty and possess, be under the influence of, or use, any of the following drugs or substances: (1) any Schedule I drug or other substance identified in Appendix D to this subchapter." Subsections (2), (3) and (4) went on to list the amphetamines, narcotics, and "any other substance" which were already listed in the old version.

The amended version does not change the considerations regarding whether Toledo could drive a truck for Nobel under the regulation. It still only prohibits possession, driving under the influence of, or use of peyote while on duty, with no prohibition of off-duty possession or use. The amended DOT regulation did list both peyote and

mescaline on Schedule I, entitled "Controlled Substances".

Peyote and mescaline have been listed on the Department of Health, Education and Welfare's (HEW) Schedule I, with an exemption for religious use. 31 Fed.Reg. 4679 (1966). Congress had created the schedules of controlled substances in the Drug Abuse Control Amendments of 1965, 79 Stat. 226 § 3(a). When the House of Representatives passed the Amendments as H.R. 2, it exempted from control "peyote (mescaline) but only insofar as its use is in connection with the ceremonies of a certified religious organization." 111 Cong. Rec. 14608 (1965). The Senate committee removed peyote and its religious exemption from the list, preferring that such drugs be added to the list on a case-by-case basis by the Secretary of HEW, based on scientific review and the recommendations of advisory groups. S.Rep. No. 89–337, quoted at 111 Cong.Rec. 14609 (1965), U.S.Code Cong. & Admin.News 1965, P. 1895. The Senate and the House then passed the bill without peyote or its religious exemption listed. In debate on the House floor, Congressman Harris assured House members that omitting the religious exemption did not prevent *bona fide* religious use because courts had upheld peyote users' First Amendment right to use peyote. Congress therefore passed the 1965 Amendments with the understanding that *bona fide* religious use of peyote was exempt from regulation.

The Department of HEW then added peyote and mescaline to Schedule I by administrative regulation in 1966, with an exemption for nondrug use in *bona fide* religious ceremonies of the Church. 31 Fed. Reg. 565, 4679 (1966).

When Congress passed the Controlled Substances Act of 1970, 84 Stat. 1242, it enacted Schedule I into law, 21 U.S.C. § 812(c) and 21 C.F.R. § 1308.11. During hearings on the 1970 Act, Congressman Satterfield expressed concern that the peyote religious use exemption be protected. The Bureau of Narcotics and Dangerous Drugs (BNDD) assured him that it would

be taken care of by regulation. Drug Abuse Control Amendments of 1970; Hearings before the Subcommittee on Public Health and Welfare of the Committee on Interstate and Foreign Commerce; H.R., 91st Cong.2d Sess. 117–18 (1970). BNDD then added the religious use exemption to its Schedule I by regulation on April 24, 1971. 36 Fed.Reg. 7776, 7802 (1971). It states, "The listing of peyote as a controlled substance in Schedule I does not apply to the nondrug use of peyote in *bona fide* religious ceremonies of the Native American Church...." 21 C.F.R. § 1307.-31 (1983). *See also Native American Church of New York v. U.S.*, 468 F.Supp. 1247 (S.D.N.Y.1979) for legislative history.

Schedule I, after 1971, does not prohibit Church religious use of peyote. Therefore, the DOT prohibition of Schedule I drug use by truck drivers in the December 5, 1984 amended version of 49 C.F.R. § 392.4 did not prohibit such religious use. Toledo's use of peyote is not use of a Schedule I drug. However, the amended version of § 392.4 still prohibits Toledo from driving under the influence of peyote, under the wording of subsection (a)(4) which prohibits "any other substance, to a degree which renders a driver incapable of safely operating a motor vehicle." Neither Congress, HEW nor BNDD have licensed Toledo to drive while under the influence of peyote. They have simply licensed him to use peyote in religious ceremonies without prohibition. The amended version of § 392.4 could be complied with if Nobel took action to insure that Toledo does not drive while under the influence. Nobel could have accommodated Toledo without undue hardship.

Nobel's arguments under its own company policy and its lease with Ryder can be disposed of similarly. Nobel policy prohibited the sale, purchase, possession or use of illegal drugs by employees on company property or during working hours. It also prohibited employees from reporting to work under the influence of illegal drugs. Nobel did not hire drivers who had used illegal drugs within the two years prior to

their hiring. Nobel's lease with Ryder, from whom it leased all its trucks, provided that Ryder could remove any driver, cancel its lease or cancel its insurance if any driver used drugs or operated trucks under the influence of drugs which impair the driver's ability to operate the truck. The Ryder Safety Manual also prohibited "drug abuse". As indicated above, Toledo's use of peyote was not an illegal use, so did not violate Nobel policy. By requiring Toledo to take a day off after each use of peyote, Nobel would have been complying with the Ryder lease terms on use or being under the influence of drugs while on the job. Toledo's religious use was not drug abuse. Therefore, neither Nobel nor Ryder policies prevented Nobel from hiring Toledo with the reasonable restriction of requiring Toledo to take a day off after each use.

Second, Nobel argues that hiring a known drug user would open it up to negligent entrustment and punitive damages liability if Toledo were involved in an accident while on duty, and that such increased liability would be undue hardship. Nobel justifiably considered this possibility as a serious problem. However, Nobel would not be opening itself up to new lawsuits, but simply to additional claims in lawsuits it would already be defending under the theory of *respondeat superior*. Also, the problem nearly evaporates when considered in light of the fact that Toledo's use of peyote was not use of an illegal drug, and that his work hours could be restricted so that he was never on duty when possibly under the influence of peyote. Therefore Nobel's hypothetical increased liability does not qualify as an undue hardship.

Third, Nobel raised a specter of having to pay overtime wages and alter its seniority system in accommodating Toledo as grounds for undue hardship. Nobel argues that if Toledo could not work on a particular Sunday, Nobel would either have to bring in another Farmington-based delivery driver and pay him overtime wages, or send a driver with a load from Albuquerque and have him also make the deliveries outside of Farmington. The Supreme Court has held that it is undue hardship for

an employer to incur more than a *de minimis* cost in overtime wages or to have to alter its seniority provisions in order to accommodate an employee's religious practices. *TWA, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

I find that under the facts of this case the payment of overtime wages would be a *de minimis* cost. Toledo has variously stated that he goes to peyote services from two to four times a year. The driver that Nobel hired instead of Toledo was required to work four Sundays during the remaining nine months of 1984, or about five Sundays per year. It is unlikely that very many Sundays when Toledo wished to attend a peyote service would overlap with Sundays Nobel required him to work. However, assuming that there were two Sundays per year when Nobel had to pay overtime to replace Toledo, and that the replacement driver worked ten hours per day at $10.20 per hour (Nobel's wage for a driver after one year), Nobel would pay $102 in overtime wages ($5.10 overtime pay × 10 hrs. × 2 days). If Nobel had to replace Toledo on four Sundays, it would pay $204 in overtime wages. This amount, or even double this amount, would be a *de minimis* cost for a company such as Nobel.

As for seniority, Nobel never proved that the drivers it would replace Toledo with would be drivers with more seniority. Presumably, Toledo would be lowest on the seniority list at first, but would have more seniority than more newly hired drivers after several months or years. At that point, he could be replaced with drivers of less seniority. Also, Nobel never proved that it could not replace Toledo without violating the seniority provisions of its contract with the Teamsters Union.

Therefore, I conclude that Nobel would not incur undue hardship from paying overtime wages or altering its seniority provisions.

■ Because Nobel failed to prove that any accommodation would have resulted in undue hardship, and it failed to make any effort at reasonable accommodation on

March 13, 1984, that decision of refusing to hire Toledo was a discriminatory decision.

■ **B. Reasonable Accommodation.** After its initial discriminatory decision, Nobel offered to accommodate Toledo's religious practice on May 17, 1984 and July 10, 1984. I find that these were good faith offers, and that their status as settlement offers during adversary proceedings before the NMHRC does not prevent them from being accommodation offers as well. Nobel was not only interested in settling the case, it was interested in hiring Toledo in such a manner that he could continue his religious practices and yet not be a safety hazard on the road.

The Nobel offer of July 10, 1984 was a reasonable accommodation offer. It allowed Toledo to attend peyote ceremonies twice a year, the number of times Toledo stated in his discrimination charge to the NMHRC. To remove any possibility that he would drive while under the influence of peyote, the offer required Toledo to take a day off after each use of peyote. This was not a day off without pay, but was his normal Sunday day off. To allow Nobel to plan for Toledo's replacement if Sunday work were required, the offer required one week's notice of his peyote use. To allow Nobel to supervise Toledo on the days after he used peyote, the offer required that Toledo work out of the Albuquerque office. These were all reasonable requirements. The offer also included $500 of back pay.

This may not have been the most reasonable offer. It may have been more reasonable to allow Toledo four or more peyote ceremonies per year, or only a few days notice instead of a week, or more back pay. But, Toledo refused to deal with Nobel. Toledo had a duty "to attempt to accommodate his beliefs himself and to cooperate with attempts at reasonable accommodation by his employer." *Chrysler Corp. v. Mann,* 561 F.2d 1282, 1285 (8th Cir.1977). The premise for Title VII's requirement of reasonable accommodation short of undue hardship is bilateral cooperation. *Brener v. Diagnostic Center Hosp.,* 671 F.2d 141, 145 (5th Cir.1982). "Although the statu-

tory burden to accommodate rests with the employer, the employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by his employer." *Id.* at 146. *See also U.S. v. City of Albuquerque, supra; American Postal Workers Union v. Postmaster General,* 781 F.2d 772 (9th Cir.1986).

■ Nobel's July 10 reasonable offer cured its March 13 discriminatory decision. Because Toledo refused to negotiate or try to cooperate with Nobel's accommodation offer, I also conclude that the offer absolves Nobel of liability for that discriminatory decision. Theoretically, Nobel is still liable for the four months during which it discriminated against Toledo. Since Toledo turned down the offer to be hired, the only possible damages owed to Toledo are four months of back wages reduced by the amount Toledo earned during that time. This amount was not proved at trial. It would likely be more than the $500 offered, but Toledo failed in his duty to negotiate a more reasonable amount. Therefore, I allow the $500 offer to stand as a reasonable offer. Toledo has already rejected it, so no award of back wages is justified.

## IV. Conclusion

It is crucial to this case that Nobel required a driver that was available to drive seven days a week. The proposed driver would normally work Monday to Saturday but had to be available to drive on Sundays. If Toledo drove a truck on the Sunday morning after a Saturday night peyote ceremony, he would have presented a significant safety hazard. Some restriction by Toledo of his religious practice was required along with some accommodation by Nobel of Toledo's practice.

Nobel initially discriminated against Toledo by failing to hire him on March 13, 1986. Nobel could have reasonably accommodated Toledo's religious practice without undue hardship. Nobel had a duty at that time to investigate the properties of peyote and the way Toledo used it sufficiently to have tried to propose a reasonable accommodation. It did not do so.

However, Nobel cured its initial discriminatory decision by making a reasonable offer of accommodation four months later. Toledo rejected that offer, and his complaint for religious discrimination must therefore be dismissed. Now, Therefore,

IT IS ORDERED that the complaint and the cause of action are hereby dismissed on the merits.

### ON MOTION FOR REVIEW OF COSTS

This matter came on for consideration on plaintiff's motion for review of the Clerk's order settling costs. Having considered the motion and the briefs of counsel, I find that plaintiff's motion is well taken and it will be granted in part and denied in part.

Plaintiff objects to the Clerk's taxing of costs in favor of defendant and against plaintiff with regard to Don Asa, Robert Collins, James Etherton, and Rodney Plagmann. Plaintiff's objections to the award of costs for James Etherton and Rodney Plagmann are well taken; his objections to the awarding of costs for Don Asa and Robert Collins are not well taken.

*Rodney Plagmann:* Defendant has agreed that this item of costs was improper as plaintiff had already paid Mr. Plagmann a witness fee.

*James Etherton:* D.N.M.R. 15(d)(3)(a) states that "[n]o party shall receive witness fees or allowances." Mr. Etherton was, at the time of trial, director of personnel for defendant, and was the only executive to appear for defendant. While Mr. Etherton was called as a witness on only the first day of trial, he was present throughout the trial. For purposes of the allocation of costs, Rule 15(d)(3)(a) distinguishes between witnesses and parties (or representatives of a company which is a party). Mr. Etherton served as representative for Nobel-Sysco, Inc. at trial, and therefore his costs are disallowed.

*Don Asa and Robert Collins:* Plaintiff objects to the award of costs for these witnesses, characterizing them as "unnecessary" and stating that I had discouraged defendant from calling these individuals as witnesses. Nevertheless, both men did testify, and 28 U.S.C. § 1920(3) does allow for the taxing of costs for witnesses. I see no reason to alter the Clerk's order with regard to the costs of either of these witnesses.

Finally, plaintiff contends I may deny some witness expenses because the witness traveled from beyond the subpoena power of this court. Plaintiff relies on *Farmer v. Arabian American Oil Co.,* 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964). Indeed, *Farmer* does stand for the proposition that a district court is plainly vested with the power to rely on its discretion in awarding or refusing to award costs outside the 100–mile area. *Farmer, supra* at 232, 85 S.Ct. at 415. However, I see no reason to alter the Clerk's order with regard to these costs (applicable to Don Asa only, as no costs will be allowed for James Etherton). Now, Therefore

IT IS ORDERED that plaintiff's motion for review be granted with respect to costs for James Etherton and Rodney Plagmann and denied with respect to Robert Collins and Don Asa.