**PEYOTE WAY CHURCH OF GOD, INC., Plaintiff–Appellant,**

v.

**Richard THORNBURGH, Attorney General of the United States, et al., Defendants–Appellees.**

No. 88–7039.

United States Court of Appeals, Fifth Circuit.

Feb. 6, 1991.

---

**1212**

Mary L. O'Connor, Jeffrey C. Glass, James K. Witcher, American Civil Liberties Union, Dallas, Tex., for plaintiff-appellant.

F. Browning Pipestem, Norman, Okl., for amicus—Kiowa and Comanche Chapters of the Native American Church.

John T. Bannon, Jr., Dept. of Justice, Crim. Div., Washington, D.C., for Thornburgh.

Charles A. Palmer, Asst. Atty. Gen., Gray & Becker, Austin, Tex., for Mattox.

Before CLARK, Chief Judge, REAVLEY and KING, Circuit Judges.

REAVLEY, Circuit Judge:

The Peyote Way Church of God, Inc. (Peyote Way) sued for a declaratory judgment that federal and Texas laws prohibiting peyote possession by all except members of the Native American Church of North America (NAC) are unconstitutional. Peyote Way also requested that the district court enjoin the defendants, the Attorneys General of Texas and the United States, from enforcing the peyote prohibition laws against it or its members. The district court upheld the constitutionality of the federal and state laws challenged by Peyote Way. On appeal, Peyote Way challenges the district court's legal conclusions and the sufficiency of the court's fact find-ings to support those conclusions. We affirm the district court's dismissal of Peyote Way's constitutional claims on their merits.

## I. BACKGROUND

Peyote is a variety of cactus that grows in significant quantities only along the part of the Rio Grande that separates South Texas from Mexico. Portions of the plant's stem commonly called "buttons" contain mescaline which has a hallucinogenic effect when ingested.

Both federal and Texas statutes criminalize the unprescribed distribution and possession of peyote. 21 U.S.C. §§ 812, 841, 844; TEX. HEALTH & SAFETY CODE ANN. §§ 481.101–481.130 (Vernon 1991). But both federal and Texas law exempt bona fide religious use of peyote by NAC members from such criminalization. 21 C.F.R. § 1307.31; TEX. HEALTH & SAFETY CODE ANN. § 481.111 (Vernon 1991).

The NAC was established in Oklahoma in 1918 as the corporate form of a centuries-old Native American peyotist religion without changing the ancient religion's practices or beliefs. See Toledo v. Nobel–Sysco, Inc., 651 F.Supp. 483, 487 (D.N.M.1986); see also People v. Woody, 61 Cal.2d 716, 720–21, 40 Cal.Rptr. 69, 73, 394 P.2d 813, 817–18 (1964) (discussing history and theology of Native American peyote use). The NAC currently has approximately 250,000 Native American members, most of whom live on reservations in the western half of this country. NAC members worship peyote as a deity and ingest the plant during traditional ritualized "road meetings."

Immanuel P. Trujillo, who was an NAC member until 1966, incorporated Peyote Way under Arizona law in 1979. Peyote Way's single place of worship is a ranch in southern Arizona. Its principals and resident members are Trujillo, Ann Zapf, and Matthew Kent. Zapf, Kent, and the majority of Peyote Way's approximately 150 non-resident members are not of Native American descent. Peyote Way has promulgated detailed bylaws concerning its members' access to peyote during its religious ceremonies and maintains records as to time,

place, and amount of peyote use by its members. Peyote Way subscribes to many tenets similar to those of the NAC.

■ After a bench trial, the district court found that

> Trujillo, Kent, and Zapf use peyote as a sacrament, and consider it to be a deity. These three resident members use peyote in connection with their religion, and sincerely believe that the use of peyote for other than religious purposes is sacrilegious.

*Peyote Way Church of God, Inc. v. Meese,* 698 F.Supp. 1342, 1344 (N.D.Tex.1988). The court also found that

> the clear intent of Congress was to exempt the nondrug religious use of peyote by members of the Native American Church, not to exempt the use of peyote by other religious groups, no matter how sincere these other religious groups are in their beliefs.

*Id.* at 1346–47. Still, the court held that there is no free exercise or implied privacy right to use peyote under the United States Constitution. The court also rejected Peyote Way's equal protection and establishment clause challenges to the NAC exemptions. We review de novo the district court's conclusions of constitutional law. *Shillingford v. Holmes,* 634 F.2d 263, 266 (5th Cir.1981).

## II. DISCUSSION

### A. FREE EXERCISE CLAUSE

In an earlier appeal of this case, we followed the time-honored precedent of *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), in holding that

> [c]onduct dictated by religious belief may be regulated or forbidden if the limitation is essential to accomplish a compelling governmental interest ... and if the attendant burden on religious observance does not exceed the least burdensome method of accomplishing that purpose.

*Peyote Way Church of God, Inc. v. Smith,* 742 F.2d 193, 200 (5th Cir.1984). Finding

insufficient evidence of a compelling state interest and least restrictive alternative to warrant summary judgment, we remanded this case for further consideration of Peyote Way's claim that federal and state laws prohibiting peyote possession infringe its members' right to freely exercise their religion. *Id.* at 202.

■ On remand, the district court concluded that the challenged peyote statutes are the least restrictive way to serve compelling governmental interests. We need not review the court's analysis because the Supreme Court's decision in *Employment Div., Dept. of Human Resources of Oregon v. Smith,* —— U.S. ——, 110 S.Ct. 1595, 1601, 108 L.Ed.2d 876 (1990) eviscerates judicial scrutiny of generally applicable criminal statutes in response to free exercise challenges. The *Smith* majority held that Oregon's statute criminalizing peyote possession withstands challenge under the free exercise clause because it is "a generally applicable [criminal prohibition] of socially harmful conduct," and does not have as its purpose the proscription of religious conduct. *Id.* 110 S.Ct. at 1599, 1603. For the same reasons, we must hold that the federal and Texas statutes prohibiting peyote possession do not offend the First Amendment's free exercise clause. The Court foresaw cases where *Smith* would "place at a relative disadvantage those religious practices that are not widely engaged in." *Id.* 110 S.Ct. at 1606. We affirm the district court's judgment that application of 21 U.S.C. §§ 841, 844 and Texas Health and Safety Code §§ 481.114, 481.117, 481.122[1] to Peyote Way and its members does not offend the First Amendment's free exercise clause.

### B. EQUALITY WITH THE NATIVE AMERICAN CHURCH

Under the heading "Special Exempt Persons," a Drug Enforcement Administration regulation provides:

> § 1307.31 **Native American. Church.** The listing of peyote as a controlled sub-

---

1. These sections criminalize the manufacture, delivery, and possession of controlled substances, including peyote.

stance [under federal law] does not apply to the nondrug use of peyote in bona fide religious ceremonies of the Native American Church. . . .

21 C.F.R. § 1307.31 (1990) *citing as authority* 21 U.S.C. §§ 821, 822(d), 871(b). The Commissioner of Food and Drugs first promulgated what is now section 1307.31 in March 1966 with apparent congressional approval. 31 Fed.Reg. 4679 (1966); *compare United States v. Warner*, 595 F.Supp. 595, 598 (D.N.D.1984) (Congress intended to exempt religious use of peyote only by NAC members) *with Native American Church of New York v. United States*, 468 F.Supp. 1247, 1249, 1251 (S.D.N.Y.1979) (Congress meant to exempt all bona fide religious peyote use), *aff'd without op.*, 633 F.2d 205 (2d Cir.1980). Texas law contains a similar exemption for the NAC:

> [t]he provisions of [the] chapter relating to the possession and distribution of peyote do not apply to the use of peyote by a member of the Native American Church in bona fide religious ceremonies of the church. . . . An exemption granted to a member of the Native American Church under this section does not apply to a member with less than 25 percent Indian blood.

TEX. HEALTH & SAFETY CODE ANN. § 481.111(a) (Vernon 1991).

These laws unambiguously exempt only NAC members from federal and Texas statutes prohibiting peyote possession. Peyote Way argues that the Constitution requires us to accord its members the same exemption.[2]

## 1. The Federal NAC Exemption
### a. Equal Protection

The equal protection principle, applicable to federal regulations through the due process clause of the Constitution's Fifth Amendment, mandates similar treatment under the law for those similarly situated. *Bolling v. Sharpe*, 347 U.S. 497, 498–99, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). Section 1307.31 accords NAC members different treatment than other members of our society. Thus, whether section 1307.31 violates the equal protection principle depends on whether NAC members are similarly situated to other members of our society.

In *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the Supreme Court rejected an equal protection challenge to a statutory employment preference for Native Americans in the Bureau of Indian Affairs (BIA). The Court based its decision on: (1) the historically unique guardian-ward trust relationship of the federal government with quasi-sovereign Native American tribes; (2) Congress' plenary power to "regulate Commerce . . . with the Indian Tribes" under the Constitution's Article I, section 8; (3) the federal government's Article II, section 2 treaty power; and (4) a line of cases in which the Court has upheld legislation preferentially treating Native Americans who are tribal members or live on or near a reservation. *Id.* 94 S.Ct. at 2483, 2485.

The Court applies strict scrutiny to any racial classification, requiring the government to show that such a classification is the least restrictive means of achieving a

---

**2.** Finding injury and redressability, we are satisfied of Peyote Way's standing to challenge the constitutionality of the NAC exemptions. The Supreme Court recognizes that illegitimate unequal treatment is an injury unto itself, "not coextensive with any [injury due to the denial of] substantive rights to the . . . party discriminated against." *Heckler v. Mathews*, 465 U.S. 728, 739, 104 S.Ct. 1387, 1395, 79 L.Ed.2d 646 (1984); *see also Coakley v. Sunn*, 895 F.2d 604, 607 (9th Cir.1990) (unconstitutional underinclusiveness is an injury for which plaintiffs may obtain redress). Peyote Way and its members would suffer unjust unequal treatment if the exemptions accorded the NAC stand and if those exemptions unconstitutionally exclude Peyote

Way's membership. And "when the 'right invoked is that to equal treatment,' the appropriate remedy is a *mandate* of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler*, 104 S.Ct. at 1395 (quoting Justice Brandeis in *Iowa–Des Moines Nat. Bank v. Bennett*, 284 U.S. 239, 247, 52 S.Ct. 133, 136, 76 L.Ed. 265 (1931)); *accord Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 109 S.Ct. 890, 896, 103 L.Ed.2d 1 (1989) (secular magazine may challenge a tax exemption for religious periodicals even if the only remedy available to the Court would be to strike the exemption and subject all periodicals to the tax).

compelling governmental objective. *See, e.g., Hunter v. Erickson,* 393 U.S. 385, 391–92, 89 S.Ct. 557, 561, 21 L.Ed.2d 616 (1969). But the *Morton* Court characterized the BIA employment preference as a political rather than racial classification because the BIA regulations implementing the preference limit eligibility to members of federally recognized tribes who have at least 25% Native American blood. 94 S.Ct. at 2484 n. 24. Thus, only the constituencies of the quasi-sovereign nations over whom the federal government considers itself guardian enjoy the preference. *Id.* And "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." 94 S.Ct. at 2485.

■ The district court in this case followed *Warner,* 595 F.Supp. at 600 in holding that the federal NAC exemption effects a political classification. Peyote Way contends that section 1307.31 effects a racial classification.

On its face, section 1307.31 classifies people according to the single criterion of whether they are NAC members. Similarly, the statute at issue in *Morton,* 25 U.S.C. § 472, accords its hiring preference to "Indians" without requiring tribal affiliation. Only the BIA regulations under § 472 contain the 25% Native American ancestry and tribal affiliation requisites relied on by the Court. *Morton,* 94 S.Ct. at 2484 n. 24. We must look to the evidence to determine whether NAC membership presupposes tribal affiliation and Native American ancestry, and thus effects a political classification under *Morton.*[3]

During his tenure as NAC National Chairman, Emerson Jackson testified that the NAC is made up of approximately 36 chapters, each separately incorporated by a different tribe and that all NAC members are of 25% Native American ancestry. The

record contains articles of incorporation filed by the Native American Church of Navajoland, Inc. and a "Certificate of Authorization" to transport peyote that requires a tribal enrollment number, corroborating this testimony. *See also Kennedy v. Bureau of Narcotics and Dangerous Drugs,* 459 F.2d 415, 416, 418 (9th Cir.1972) ("[t]he Native American Church is a religious organization of American Indians drawn from a variety of western tribes;" "[m]embership in the Native American Church is limited to those of at least one-quarter Indian blood"), *cert. denied,* 409 U.S. 1115, 93 S.Ct. 901, 34 L.Ed.2d 699 (1973). Jackson repeatedly testified that tribal membership and 25% Native American ancestry are prerequisites to NAC membership and although Peyote Way's counsel cross-examined him, Peyote Way offers nothing to impeach his testimony.

In arguing that the NAC admits spouses of Native Americans regardless of ancestry, Peyote Way cites the Articles of Incorporation of the Native American Church of Navajoland:

> Membership in this Corporation shall be limited to persons with at least twenty-five percent Indian blood; provided, that any non-Indian spouse of a member is eligible for membership. *Other qualifications for membership may be set out in the Bylaws.*

Art. VIII, § 2 (emphasis added). But Jackson testified that "[i]n our bylaws, we stipulate that they be 25 percent Indian." *See also Warner,* 595 F.Supp. at 601–02 ("[t]he government has filed the by-laws of the Native American Church of North America, which require members to have at least one-quarter Native American blood").

Peyote Way also cites Trujillo's. testimony that he was an NAC member without ever having a tribal enrollment number and that during his NAC membership he saw many who are not Native Americans partic-

---

3. While we agree with Peyote Way that the district court did not make the findings of fact required by Fed.R.Civ.P. 52(a) to support its political classification holding, "[w]here the facts relied upon to support the judgment are in the record and are undisputed remand is unnecessary." *Gulf Towing Co. v. Steam Tanker,*

*Amoco New York,* 648 F.2d 242, 245 (5th Cir. 1981). The parties have contested the NAC's compliance with *Morton's* tribal affiliation and 25% Native American ancestry requirements throughout this fully matured litigation, so we are confident that the parties have submitted the evidence that they have on this issue.

ipate in NAC rites and vote for NAC leadership. But Trujillo left the NAC before or during 1966, and peyote possession was not a federal offense until May 1966. *See* 79 Stat. 226 § 11; 31 Fed.Reg. 4679–80 (1966). Trujillo himself testified that in 1964 the NAC's leadership accepted and almost immediately thereafter rejected an "All–Race Group" within the NAC. Trujillo's testimony does not establish that the NAC has admitted members who are not tribal Native Americans since the federal government outlawed peyote possession and promulgated the NAC exemption.

We hold that the record conclusively demonstrates that NAC membership is limited to Native American members of federally recognized tribes who have at least 25% Native American ancestry, and therefore represents a political classification. Thus, under *Morton*, we must now consider whether the preference given the NAC "can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians." 94 S.Ct. at 2485. "As [the Supreme Court has] repeatedly emphasized, Congress' authority over Indian matters is extraordinarily broad." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72, 98 S.Ct. 1670, 1684, 56 L.Ed.2d 106 (1978).

■ We hold that the federal NAC exemption allowing tribal Native Americans to continue their centuries-old tradition of peyote use is rationally related to the legitimate governmental objective of preserving Native American culture.[4] Such preservation is fundamental to the federal government's trust relationship with tribal Native Americans. Under *Morton*, Peyote Way's members are not similarly situated to those of the NAC for purposes of cultural preservation and thus, the federal government may exempt NAC members from statutes prohibiting peyote possession without ex-

tending the exemption to Peyote Way's membership.

#### b. Establishment Clause

Peyote Way also contends that the federal NAC exemption contravenes the First Amendment's admonition that "Congress shall make no law respecting an establishment of religion." The Supreme Court has "repeatedly emphasized [its] unwillingness to be confined to any single test or criterion in [the] sensitive area" of establishment clause jurisprudence. *Lynch v. Donnelly*, 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984).

In *Larson v. Valente*, 456 U.S. 228, 244–51, 102 S.Ct. 1673, 1683–87, 72 L.Ed.2d 33 (1982) the Court struck down a Minnesota statute imposing registration and reporting requirements on religious organizations that solicit more than 50% of their income from non-members because the statute represented a denominational preference that was unnecessary to achieve a compelling state interest. Yet in *Marsh v. Chambers*, 463 U.S. 783, 795, 103 S.Ct. 3330, 3338, 77 L.Ed.2d 1019 (1983), the Court's majority did not mention *Larson* and did not apply strict scrutiny in upholding against an establishment clause challenge Nebraska's practice of paying a chaplain to open each legislative session with a prayer. The Court upheld Nebraska's chaplaincy practice notwithstanding its recognition that the same Presbyterian clergyman was selected as chaplain for 16 years and the chaplain prayed in the Judeo–Christian tradition. *Id.* 103 S.Ct. at 3337. The *Marsh* majority reached its decision based on the "unambiguous and unbroken history of more than 200 years ... of opening legislative sessions with prayer" and the framers' participation in this practice. *Id.* 103 S.Ct. at 3335–36. Still, *Lynch* cites both *Larson* and *Marsh* with approval in consecutive sentences. 104 S.Ct. at 1362.

---

**4.** The federal defendant explains that section 1307.31 exempts only NAC members because that is the only bona fide tribal Native American peyotist religion of which the government is aware. While this explanation satisfies us as to the exception's rationality, we note that another bona fide tribal Native American peyotist organization may well have a valid equal protection

claim based on the federal NAC exemption. Peyote Way, not being a tribal Native American organization, is not the proper plaintiff to raise this claim. *Accord State v. Forge*, 262 N.W.2d 341, 345 n. 10 (Minn.1977) (en banc), *appeal dismissed for want of substantial federal question*, 435 U.S. 919, 98 S.Ct. 1479, 55 L.Ed.2d 512 (1978).

The markedly different approaches the Court takes to answering establishment clause questions remind us that

> [t]he course of constitutional neutrality in [First Amendment jurisprudence] cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions.... The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.

*Walz v. Tax Com. of City of New York,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1411–12, 25 L.Ed.2d 697 (1970). While we recognize that the establishment clause exists to ensure government neutrality toward religion, we agree with Justice Harlan that "[n]eutrality in its application requires an equal protection mode of analysis." *Id.* 90 S.Ct. at 1425 (Harlan, J., concurring); *accord Olsen v. Drug Enforcement Administration,* 878 F.2d 1458, 1463 n. 5 (D.C.Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1926, 109 L.Ed.2d 290 (1990). And in determining whether the NAC is similarly situated to other religions, we will not ignore the fact that "tribes remain quasi-sovereign nations which, by government structure, *culture,* and source of sovereignty are in many ways foreign to the constitutional institutions of the federal and state governments." *Santa Clara Pueblo,* 98 S.Ct. at 1684 (emphasis added).

The unique guardian-ward relationship between the federal government and Native American tribes precludes the degree of separation of church and state ordinarily required by the First Amendment. The federal government cannot at once fulfill its constitutional role as protector of tribal Native Americans and apply conventional separatist understandings of the establishment clause to that same relationship.

■ Above, we relied on Supreme Court precedent to hold that the federal NAC exemption represents a political classification as to Peyote Way. While the exemption facially singles out one religion, we accept the government's explanation that this was done because the NAC is the only tribal Native American organization of which the government is aware that uses peyote in bona fide religious ceremonies. We know of no evidence to the contrary. Thus, we hold that the federal NAC exemption represents the government's protection of the culture of quasi-sovereign Native American tribes and as such, does not represent an establishment of religion in contravention of the First Amendment.

### 2. The Texas NAC Exemption

Peyote Way also presents Fourteenth Amendment challenges to Texas' NAC exemption [5] under the equal protection clause and the incorporated establishment clause, which amount to the same challenges levied at the federal NAC exemption. The similarity of language, date of passage, and legislative history of Texas' NAC exemption all indicate that the Texas legislature enacted the exemption to parallel the federal NAC exemption.[6]

■ The district court upheld Texas' NAC exemption under the Constitution's supremacy clause, implicitly reasoning that the federal NAC exemption preempts Texas' peyote prohibition statute. *Peyote Way Church of God, Inc. v. Meese,* 698 F.Supp. at 1349. The district court's reasoning cannot stand after the Supreme Court upheld Oregon's statute prohibiting peyote posses-

---

**5.** The only major source of peyote in this country is in South Texas. Although Peyote Way's solitary place of worship is in Arizona, its members, like all others who require more than a few peyote buttons a year, must obtain their peyote supply from Texas.

**6.** For example, Rep. Von Dohlen, a sponsor of the Texas Controlled Substances Act, stated during floor debate on the legislation that "[t]he bill is designed to compliment the 1970 federal Controlled Substances Act ... it is important to have uniform provisions." DEBATE ON TEX. H.B. 447 ON THE FLOOR OF THE HOUSE OF REPRESENTATIVES, 63d Leg.Reg. Session (May 3, 1973).

sion by NAC members.[7] *Smith*, 110 S.Ct. at 1606. But *Smith's* implied holding that states need not conform with the federal NAC exemption does not bear on whether states may choose to so conform. We recognize an issue in this case that has not yet been directly addressed by American courts, namely whether states may enact laws beneficial to tribal Native Americans in exercise of the federal government's trust power pursuant to implied Congressional authorization.

■ Peyote Way argues that because the Constitution and the seminal Native American law cases only recognize a guardian-ward relationship between the federal government and tribal Native Americans, we must subject Texas' NAC exemption to strict scrutiny under the equal protection and establishment clauses. Indeed, the Supreme Court holds that "[s]tates do not enjoy this same unique [trust] relationship with Indians." *Washington v. Confederated Bands and Tribes of Yakima Indian Nation*, 439 U.S. 463, 501, 99 S.Ct. 740, 761, 58 L.Ed.2d 740 (1979). Yet the Court upheld Washington's statutory assumption of partial civil and criminal jurisdiction over Yakima lands against an equal protection challenge because Washington's statute "was enacted in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over the Indians." *Id. Yakima* teaches that states may exercise the federal trust power pursuant to express Congressional authorization.

Although Congress has not expressly authorized states to adopt the federal NAC exemption, we think that it would be preposterous to attribute any other intent to Congress. When the federal government entered the arena of drug control, it purposely left intact the states' enforcement structures. *See* 21 U.S.C. § 903 (states may regulate drugs concurrently with Congress unless there is a "positive conflict" between federal and state law). If the states are to enforce their own laws controlling peyote possession, they may, per *Smith*, refuse all exemptions, exempt only NAC members, or exempt all bona fide religious peyote use. If Congress wanted states to prohibit NAC peyote use, there would be no reason for its members to tolerate the continued existence of the 25–year–old federal exemption. Just before the federal NAC exemption was first promulgated, Congress rejected the alternative now proposed by Peyote Way—that all bona fide religious peyote use be allowed.[8] Thus, we conclude that Congress would want states to exercise its trust power in

---

**7.** In at least two briefs before the *Smith* Court, attorneys for the plaintiff NAC members argued that the federal NAC exemption preempts Oregon law. Brief for Respondents at n. 36 (No. 88–1213, filed July 14, 1989); Brief Amici Curiae of the American Jewish Congress on Behalf of Itself and the Synagogue Council of America in Support of Respondents at n. 28 (No. 86–947, filed July 29, 1987) (LEXIS, Genfed library, Briefs file). We deem the Court to have considered the dispositive preemption issue raised in *Smith* although none of the case's three opinions mentions the issue. *See,* 110 S.Ct. at 1615 (O'Connor, J., concurring); *id.* 110 S.Ct. at 1618 n. 5 (Blackmun, J., dissenting).

**8.** In forming the federal law that would be the first to proscribe peyote possession, the House opted for a version that exempted peyote use "in connection with the ceremonies of a bona fide religious organization." H.R.2, 89th Cong., 1st Sess., 111 Cong.Rec. 14608 (1965). But the Senate objected and the final version contained no exemption, leaving the NAC's exemption to administrative regulation. *See* 79 Stat. 226 § 3(a) (1965).

Peyote Way argues at length that the legislative history to the Drug Abuse Control Amendments of 1965 supports a holding that Congress intended to permit all bona fide religious peyote use. We find this position untenable because Congress revamped federal controlled substance laws in 1970 fully aware of the NAC exemption without changing it. *See* DRUG ABUSE CONTROL AMENDMENTS OF 1970, HEARING BEFORE THE SUBCOMMITTEE ON PUBLIC HEALTH AND WELFARE OF THE COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE, 91st Cong., 2d Sess., at 117–18 (1970); *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979) ("A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent.... Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the [agency's] interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent reenactments of the statute").

exempting NAC members from their laws prohibiting peyote possession.

We are not alone in finding under the circumstances an implied congressional will that, pursuant to federal regulation, states exercise the federal trust power for the benefit of tribal Native Americans. In *Livingston v. Ewing*, 601 F.2d 1110, 1116 (10th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 147, 62 L.Ed.2d 95 (1979), the Tenth Circuit upheld against an equal protection claim a Santa Fe, New Mexico ordinance prohibiting sales by persons other than Native Americans within 50 feet of any established business offering for sale handcrafted jewelry. The court held that 42 U.S.C. § 2000e–2(i) "is fully applicable here and is dispositive of this case." *Id.* at 1115. Section 2000e–2(i) provides that

> [n]othing contained in [the anti-discriminatory provisions of the Equal Employment Opportunity Act] shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.

The *Livingston* court found congressional support for its holding in *Morton's* discussion of section 2000e–2(i):

> [t]hese 1964 exemptions as to private employment indicate Congress' recognition of the longstanding federal policy of providing a unique legal status to Indians in matters concerning tribal or "on or near" reservation employment. The exemptions reveal a clear congressional sentiment that an Indian preference in the narrow context of tribal or reservation-related employment did not constitute racial discrimination of the type otherwise proscribed.

*Livingston*, 601 F.2d at 1113–14, *citing Morton*, 417 U.S. at 548, 94 S.Ct. at 2481. The court concluded that the Livingstons' equal protection challenge to the city ordinance favoring Native Americans living on or near a reservation "fails because Congress was fully justified in extending to the Indians the exemptions that are considered and favorably discussed in *Morton*." *Livingston*, 601 F.2d at 1116. Without saying so, the *Livingston* court necessarily inferred from section 2000e–2(i) a congressional delegation of trust power allowing the city of Santa Fe to favor Native American enterprises under *Morton's* equal protection analysis.

The court in *St. Paul Intertribal Housing Bd. v. Reynolds*, 564 F.Supp. 1408 (D.Minn.1983) relied on *Livingston* in holding that "[s]tate action for the benefit of Indians *can* also fall under the trust doctrine and therefore be protected from challenge under the equal protection clause or civil rights statutes." *Id.* at 1412 (emphasis added). In a footnote, the court added that *"Morton v. Mancari* referred to 'Congress' unique obligation, while the passage above refers to a more general obligation of the government. *Taken in context* it indicates that the trust relation extends to the states." *Id.* at 1412–13 n. 6 (emphasis added). While the *Reynolds* court may have overstated the states' ability to exercise the federal trust power, its application of the principles there set forth is consistent with our holding in this case. The *Reynolds* court upheld against an equal protection challenge a Minnesota statute that authorizes a state agency to distribute federal funds for urban Native American housing programs. But before doing so, the court parsed legislative history to assure itself that federal statutes expressed congressional intent to benefit Native Americans with funds appropriated to the Department of Housing and Urban Development. *Id.* at 1411–13.

■ In construing the federal NAC exemption to permit states to enact congruent exemptions to their controlled substance laws, we are mindful of the settled principle of statutory construction that "statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Bryan v. Itasca County, Minnesota*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976) (citations omitted). As a valid exercise of the federal trust power, Texas' NAC

exemption withstands Peyote Way's equal protection and establishment clause challenges under the rationale that we articulated above for upholding the federal NAC exemption's constitutionality.

## C. PRIVACY RIGHT

 Peyote Way argues that the federal and Texas NAC exemptions impermissibly burden the child-rearing and marital choices of its members who wish to propagate their peyotist faith. But there is no fundamental right under the Fifth Amendment's due process clause to practice, or to raise a child who practices, a religion in contravention of otherwise valid laws, and we will not infer one. See Bowers v. Hardwick, 478 U.S. 186, 194, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986) (Court not "inclined to take a[n] expansive view of [its] authority to discover new fundamental rights imbedded in the Due Process Clause"). Absent such a right, we agree with the district court that the NAC exemptions do not burden Peyote Way's members' marital and child-rearing choices.

## III. CONCLUSION

Because we find that 21 U.S.C. §§ 841, 844, 21 C.F.R. § 1307.31, and Texas Health and Safety Code §§ 481.111(a), 481.114, 481.117, 481.122 do not violate any constitutional provision cited by Peyote Way, we AFFIRM the district court's judgment denying Peyote Way declaratory and injunctive relief.

CLARK, Chief Judge, dissenting:

I respectfully dissent from the majority's decision affirming the district court's dismissal of the constitutional attack on a federal regulation and Texas law that criminalize possession and use of peyote but exempt members of the Native American Church from such possession and use in religious services. I would hold that the exemptions violate the constitutional bar against making laws "respecting an establishment of religion."

Employment Div., Dept. of Human Resources of Oregon v. Smith permitted Oregon's general criminal prohibition on the use of peyote to be enforced against members of the Native American Church who ingested peyote as a religious sacrament. The Court held the criminal statute of general applicability did not constitute a law prohibiting the free exercise of religion. The Court's decision necessarily upholds the underlying regulatory and statutory bans imposed by the federal government and the State of Texas that are involved here. The majority agrees with this interpretation of Smith.

Where we part company is over whether the exemption in the federal regulation and the Texas statute constitute a law "respecting an establishment of religion." The sole function of the exemption is to permit the Native American Church to worship in a way that violates the constitutionally validated prohibition of peyote use for any purposes. In my view, the fact that the impetus for the exemption arose from the federal government's paternalistic interest in American Indians and the "me too" view of Texas cannot convert this purely religious exemption into a political one. This exemption is nothing more or less than a law respecting an establishment of religion, barred by the plain words of the first phrase of the first amendment.

Holding the exemption granted in the regulation and statute to be unconstitutional eliminates the need to reach the majority's equal protection analysis. However, I do not regard the issue here as one controlled by Morton v. Mancari. Authentication of preferential hiring of Indians in the Bureau of Indian Affairs is no authority to make a law respecting an establishment of religion. Because the exemption has only a purely religious purpose, the equal protection analysis should subject the exemption to the same level of equal protection scrutiny applied to any other law creating a preference for only one sect's religious practice.

I do agree with the majority's affirmance of the district court's denial of injunctive relief. Peyote Way wants the unconstitutional exemption, but not the constitutional ban, extended to it. This, of course, cannot be. Holding the Native American Church

exemption unconstitutional gives Peyote Way no right to enjoin enforcement of the valid provisions of the regulation and law criminalizing the use of peyote in religious practices. Whether the exemption is severable is an unbriefed question for another day in another case.

Because I would reverse the district court's judgment holding the exemption constitutional, I respectfully dissent.